## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| CHRISTY WALLACE, on behalf of herself and all others similarly situated,<br><br>    *Plaintiff*,<br><br>v.<br><br>NEW DIRECTION IRA, INC., NEW DIRECTION TRUST COMPANY, and MAINSTAR TRUST,<br><br>    *Defendants*. | No. 2:24-CV-02007<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Christy Wallace ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following against Defendants New Direction IRA, Inc., New Direction Trust Company, and Mainstar Trust (formerly known as First Trust Company of Onaga) (collectively "Defendants") upon personal knowledge as to her own acts, and based upon her investigation, her counsel's investigation, and information and belief as to all other matters.

## INTRODUCTION

1.  Plaintiff and the Class are investors in precious metals held in self-directed Individual Retirement Accounts ("SDIRAs") offered and managed by Defendants.

2.  Plaintiff and the Class lost their retirement savings when the precious metals held in their SDIRAs were stolen from the depository where they had been placed for storage.

3.  That depository, First State Depository ("FSD"), was used by fraudster Robert L. Higgins to misappropriate customer assets in a scheme dating back to at least January of 2014.

4.  On September 27, 2022, the Commodity Futures Trading Commission ("CFTC") filed a lawsuit in the U.S. District Court for the District of Delaware against FSD, Higgins and another entity controlled by Higgins alleging the organized theft of silver stored at FSD, which Higgins also controlled. *See Commodity Futures Trading Commission v. First State Depository Company et al.*, No. 1:22-cv-01266-RGA (D. Del.). The CFTC asserted violations of the Commodity Exchange Act and related regulations.

5.      A Receiver was promptly appointed in the CFTC lawsuit, and on October 4, 2022, the Receiver took control of the FSD premises.

6.      A professional services firm retained by the Receiver performed an accounting and soon discovered that precious metals were missing from over 1,000 accounts at FSD, including from hundreds accounts belonging to Plaintiff and the Class, investors in SDIRAs managed by Defendant New Direction Trust Company  ("NDTCO").

7.      Plaintiff first learned about the theft of her assets in early 2023 when she received an email from NDTCO informing her about a claims process for her assets that was underway in the CFTC lawsuit.

8.      According to the Receiver, "this may be the largest theft from a depository in the history of the United States."[1] The CFTC alleges that more than $110 million in precious metals held at FSD was missing. Of these missing assets, the vast majority, 90%, belonged to SDIRAs.[2] A disproportionate number of these accounts, more than half of all the SDIRAs at FSD, contained precious metals belonging to Plaintiff and the Class.[3]

9.      As alleged herein, Defendants recommended to Plaintiff and the Class that they store the precious metals in their SDIRAs at FSD.

10.      Undisclosed was that Defendants and FSD had a long-running, mutually beneficial business relationship and promoted each other's services to investors. Defendants knew or should have known for years about Higgins' fraud and theft of client assets from FSD, yet Defendants did nothing to warn their customers or shield them from harm.

11.      What few assets remained have now been distributed by the Receiver, and hundreds of Defendants' customers lost tens of millions of dollars in retirement savings.

---

[1] https://fsdreceivership.com/wp-content/uploads/2023/08/Doc%20157%20Receiver%27s%20Fifth%20Status%20Report%20-%2008.23.23.pdf
[2] https://fsdreceivership.com/wp-content/uploads/2023/01/Doc%2078%20The%20Report%20of%20the%20Receiver%27s%20Accounting%20Firm_1.9.2023.pdf
[3] *Id.*

12.     Defendants actively encouraged their customers to choose FSD as their SDIRA depository and included it in their representations as "approved" for the precious metals in the subject accounts. In turn, FSD advertised Defendants' products and services for nearly a decade.

13.     Defendants profited from this cross-marketing arrangement and ignored or actively covered up glaring red flags about FSD and Higgins.

14.     Defendants assured their customers that their SDIRA precious metals were safe and that the depository was "extremely secure and heavily insured." Defendants sent annual statements to Plaintiff and the Class for years without properly verifying that the precious metals were actually at FSD. All of Defendants' assurances and representations were false.

15.     Plaintiff brings this case on behalf of herself and the Class whose retirement savings vanished while under custody and administration by Defendants

## PARTIES

8.     Plaintiff Christy Wallace is a resident of Long Beach, California. Plaintiff opened a SDIRA with Defendants in July of 2016. Plaintiff is a citizen of California.

9.     Defendant NDIRA is a Colorado corporation with its principal place of business located in Colorado. NDIRA is a citizen of Colorado.

10.     Defendant New Direction Trust Co. ("NDTCO") is a Kansas company with its principal place of business located in Colorado. NDTCO is the new form of NDIRA and, on information and belief, operates with substantially the same assets, customers, employees, and officers as belonged to NDIRA. NDTCO is a citizen of Kansas.

11.     Defendant Mainstar Trust ("Mainstar"), formerly the First Trust Company of Onaga, is a Kansas bank and trust company with its principal place of business located in Kansas. Mainstar is a citizen of Kansas.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000 as to Plaintiff, and is between the citizens of different States.

13.     This Court also has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

14.     The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff is a citizen of California and none of the defendants are California citizens.

15.     The Court has personal jurisdiction over NDTCO and Mainstar pursuant to Fed. R Civ. P. 4(k)(1)(A), because they are Kansas entities, actively registered to do business in Kansas and are therefore subject to general jurisdiction in Kansas.

16.     The Court has personal jurisdiction over NDIRA pursuant to Fed. R Civ. P. 4(e) and the Kansas long-arm statute, Kan. Stat. Ann. § 60-308(b)(1), which provides that an out-of-state party has submitted to personal jurisdiction in Kansas courts if, among other things, the claims against that party arise from the party "[t]ransacting any business" in Kansas. NDIRA has submitted to personal jurisdiction in Kansas under the long-arm statute because Plaintiff's claims against it arise from its business with NDTCO and Mainstar, both of which are Kansas companies, and its years' long practice of conducting business closely with Mainstar, causing NDIRA to have the requisite Kansas contacts.

17.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (c)(2).

## FACTS

### I.     Self-Directed Individual Retirement Accounts.

18.     Self-Directed IRAs or SDIRAs are designed to allow individuals to invest their retirement funds in unconventional assets normally prohibited for retirement accounts.

19.     While SDIRAs offer individuals flexibility in terms of available asset classes, they are also far less regulated.

20.     SDIRAs may be used to invest in precious metals such as gold and silver bars and coins.

21.     In a precious metals SDIRA, there are up to five parties involved: (1) the investor, (2) the account Custodian, (3) the account Administrator, (4) the precious metals dealer (who sells them to the investor), and (5) the depository where the precious metals are stored.

22.     The assets in a SDIRA cannot be personally held by an individual investor.

23.     In a typical SDIRA, the Custodian holds title to the assets in the account and arranges for the movement of assets.

24.     The Administrator, in turn, will handle the paperwork, supervision, and administration of the account.

25.     A depository is a secure facility where precious metals in the SDIRAs are physically located.

**II.     Plaintiff Opens a SDIRA and Invests in Precious Metals.**

26.     In July of 2016, Plaintiff opened a SDIRA account at NDIRA for the purpose of investing in precious metals.

27.     NDIRA was the Administrator of the account and Mainstar (then known as First Trust Company of Onaga) was the Custodian.

28.     NDIRA processed all of the paperwork associated with setting up the SDIRA. NDIRA required that all communications to other parties pass through NDIRA.

29.     When Plaintiff first contacted NDIRA about creating a SDIRA, she was instructed to select one of two depositories approved by NDIRA for storage of her precious metals.

30.     Plaintiff was advised that although NDIRA identified two approved depositories, only one depository was actually recommended by NDIRA: FSD.

31.     Plaintiff had never heard of FSD until it was recommended to her by NDIRA as she was setting up her account.

32.     Based on NDIRA's representations, Plaintiff elected FSD as the location to hold the assets in her SDIRA.

33.     Plaintiff purchased her precious metals from dealer JM Bullion. Plaintiff instructed that her precious metals be sent to FSD for storage.

34.     When Plaintiff created the SDIRA in July of 2016, the assets included gold bullion, consisting of 37 1-oz gold American Eagles and 7 1-oz gold bars. At that time, the total investment was valued at approximately $60,000.

35.     In October 2017, Plaintiff invested in 63 additional 1-oz gold American Eagles, as well as several 1-oz silver bars and .25 oz gold American eagle coins. These assets were also sent for storage at FSD. By the end of 2017, Plaintiff's gold and silver was worth approximately $142,108.02.

36.     In or around 2018, NDIRA restructured into NDTCO. In so doing, NDTCO voluntarily assumed the responsibility as both Administrator and Custodian for the accounts under its management and control.

37.     NDTCO lists the nature of business as including, among other things, the "safekeeping of personal property of every description" and "to buy and sell foreign or domestic exchange, gold, silver, coin or bullion."

38.     Plaintiff was not permitted to physically access any of her assets within the depository without prior approval from NDIRA, or later, NDTCO (together, "New Direction").

39.     New Direction received all payments for account related fees from Plaintiff and would then pay such fees to other parties providing compensable services, including FSD.

40.     Plaintiff's account at FSD, along with hundreds of other like accounts, was under the name and control of New Direction.

41.     From the date of her initial investment forward, Plaintiff continued to make required payments to New Direction and to receive annual reports and statements showing all assets were present and accounted for, including in an annual statement for the period January 1, 2022 through December 31, 2022.

**III.     First State Depository.**

42.     At relevant times, FSD described itself as a secure private depository for storing precious metals and coins in a commercial or private capacity.

43.     According to the CFTC lawsuit, FSD was controlled by Higgins as its managing member, president or chief executive officer.

44.     Despite FSD's preferred status within New Direction, FSD has never actually been registered as a depository by the CFTC in any capacity.

45.     FSD made its services available to a variety of clients including SDIRAs investing in precious metals.

46.     At all relevant times, FSD claimed to carry sufficient insurance.

47.     New Direction held title to over 1,000 SDIRA accounts stored at FSD. Assets controlled by New Direction at the depository amounted to tens of millions of dollars.

**IV.     The CFTC Sues FSD and Higgins.**

48.     On September 27, 2022, after a lengthy investigation, the CFTC brought suit in the District of Delaware against FSD and Higgins (and Argent Group, another company controlled by Higgins), alleging a massive fraudulent scheme originating as early as January 2014 and asserting claims under the Commodity Exchange Act and related regulations.

49.     The CFTC alleged that the named defendants engaged in a scheme in connection with the purchase and sale of precious metals, including but not limited to transactions in silver coins as part of a silver leasing program known as the "Maximus Program." The named defendants deceived participants in the Maximus Program and participants in a parallel lease program called the Silver Lease Program, as well as other customers that were not part of the Maximus Program or Silver Lease Program such as Plaintiff and the Class.

50.     Among other things, according to the CFTC lawsuit, the scheme involved (a) misappropriation of customer funds and assets; (b) leading customers to believe their precious metals were held at FSD when they actually were not; (c) misappropriating funds and assets belonging to certain clients and deceiving them when they asked FSD to return the assets; and (d) deceiving customers and clients about the insurance FSD maintained.

51.     On September 29, 2022, the Court issued a Statutory Restraining Order and appointed a Receiver.

52.     The Receiver engaged Baker Tilly, a professional services firm, to perform an inventory at the FSD premises. According to Baker Tilly's report, "the accounting and business offices were in disarray, with papers spread in a disorganized manner over desks, etc.  As in most insolvency cases, Baker Tilly searched for typical accounting records such as current cash receipts

and disbursement journals, recent bank statements, recent general ledgers and financial statements, vendor files, and the like. While we did locate a few items that were several years old, we did not locate any real set of the records described above, in a dedicated area such as the accounting offices, or anywhere in the Premises."

53.     Baker Tilly also observed the abject conditions of the actual asset storage: "During our inventory procedures, we observed multiple instances of empty deposit boxes that FSDC's inventory reports indicated should have contained items. In some instances, empty boxes contained red tags with varying notes, including "IOU" and/or "-" an item description. In other instances, we located deposit boxes that contained only part of the expected contents. In yet other cases, we located deposit boxes that appeared to be complete and in agreement with FSDC's inventory management system reports. Lastly, we observed other deposit boxes that were located with identifiers not indicated on the FSDC inventory reports."

54.     Plaintiff was only able to recover a small fraction of the assets in her New Direction SDIRA. Plaintiff recovered approximately $14,000 and the Receiver estimated the value of her stolen precious metals at $230,900.00.

55.     New Direction never attempted to help Plaintiff, assist in the recovery from FSD, or take any responsibility whatsoever for Plaintiff's losses.

56.     Instead, New Direction continued to charge Plaintiff high fees and maintenance charges even after she had closed her account and had an account balance of zero.

57.     Plaintiff's experience is typical of the hundreds of investors who lost their retirement savings because they were directed to FSD by New Direction.

**V.      New Direction Had a Close Relationship with FSD and Higgins.**

58.     New Direction had a close business relationship with FSD and Higgins. The relationship began as early as 2010, and expanded when New Direction split off from the "Entrust Group" in 2011.

59.     FSD advertised the services of New Direction on its website and directed customers to New Direction, and in turn New Direction recommended, directed, or otherwise instructed customers who wished to invest in precious metals to store them at FSD.

60.     Despite New Direction's claims that it did not endorse any depository, in practice, its customers were steered towards FSD.

61.     As alleged herein, Plaintiff was given only two depositories to choose from, and when Plaintiff asked which depository New Direction recommended, she was told New Direction only recommended FSD.

62.     The relationship between FSD and New Direction can be demonstrated not just through Plaintiff's experience, but also through the large percentage of SDIRA accounts at FSD where New Direction was the Custodian (more than half of all such SDIRA accounts).

63.     On information and belief, New Direction actively instructed agents and employees to push FSD's services and to recommend them to customers.

64.     This relationship is further evidenced by the extensive advertising campaign conducted on FSD's website for New Direction.

65.     For example, in February of 2014, FSD's website contained the following list of advertisements for New Direction:

    a.  A large banner in the middle of the FSD home-page advertising the "exciting times at New Direction IRA" and instructing visitors to "Find Out More"[4]

    b.  Six out of the seven articles on the "News and Media" tab were articles or advertisements in support of New Direction.[5] The titles included:

        i.  "First State Depository Announces Relationship with New Direction, Self-Directed IRA Administrator"

        ii.  "Entrust New Direction IRA's New Golden Health Savings Account Offers Gold Investment Opportunity"

---

[4] See Exhibit A.
[5] See Exhibit B.

      iii.   "Precious Metals IRA Investors Have 30 Days To Take Back Control And Save Money With An Entrust New Direction Precious Metals IRA."[6]

      iv.   "New Direction IRA Makes A Change"[7]

      v.   "How to Exchange Gold and Other Precious Metals: New Direction IRA Announces Industry-Best Metals Exchange Process"[8]

  c.  On the "Accounts We Offer" page under "IRA Custody Account" is a section which reads: "In order to Open an IRA Custody Account you MUST either already have a self Directed IRA established, or your [sic] NEED TO OPEN a Self Directed IRA with an IRA Administrator such as New Direction IRA."[9] There is also a large phony seal on the webpage which reads "IRA Approved."

  d.  On the "Gold IRA's & 401K's page," New Direction IRA is the only IRA company mentioned or linked, and, although unattributed, New Direction senior officers are quoted on the page.[10]

66.    Many of the articles, advertisements, and in-line text materials were made with either the knowledge of, or were in some cases were written by, New Direction.

---

[6] This article encouraged customers to switch from Goldstar Trust Company, a New Direction competitor, and to invest with New Direction while advertising New Direction's cheaper services, high degree of control, and "easy transfer program."

[7] This article discussed the separation of New Direction from its previous franchisor "Entrust Group."

[8] This article addressed how New Direction was faster than competitors when it came to exchanging metals because "Most IRA providers need weeks to perform an exchange, requiring investors to sell the metals, wait for the money to come back to the IRA, purchase new metals, and ship new metals." New Direction advertised how it could do everything in the depository with only "online paperwork" submitted.

[9] See Exhibit C.

[10] See Exhibit D.

67.     For example, the section of the FSD website entitled "**The First State Solution: Set up a IRA or 401K Custody Account**"[11] appears to be an almost exact duplicate of language from an article written by the Founder and CEO[12] of New Direction, Bill Humphrey.[13]

68.     In fact, the only major difference appears to be that the article did not disclose Humphrey as the author and implies that the author is FSD, and the name "Entrust New Direction IRA, Inc." has been shortened to read "New Direction IRA, Inc." which was the newer name of Humphrey's company following its split from Entrust.

69.     These advertisements, among others, provided substantial benefits to New Direction. Between 2010 when "Entrust New Direction IRA, Inc." first announced its "Relationship" with FSD and 2014, New Direction's assets under management grew from $300 million to $1 billion.[14] As of 2023, NDTCO claims it has $3.7 billion dollars in cash and assets under management.

70.     On information and belief, Higgins and Humphrey, as principals of FSD and New Direction, respectively, have worked together for years and enjoy a close business and personal relationship.

71.     FSD continued to run advertisements for, and to direct customers towards, New Direction until at least 2021.

72.     By virtue of its longstanding business relationship with FSD and Higgins, New Direction knew or should have known about the CFTC investigation and lawsuit long before New Direction disclosed it to its clients in an email in February of 2023.

73.     Notably, by at least May 13, 2021, New Direction appears to have removed FSD from its list of "approved" depositories according to archival web searches.[15]

---

[11] *Id.*

[12] At relevant times, Humphrey was the CEO of New Direction. Humphrey appears to have transitioned from the CEO to CFO role in or about 2023.

[13] See Exhibit E.

[14] https://ndtco.com/about-us/

[15] https://web.archive.org/web/20210513183721/https://ndtco.com/precious-metals-depository/

74.     However, New Direction failed to disclose any concerns to the hundreds of customers New Direction itself had steered to FSD.

75.     Indeed, even after the FSD depository assets were frozen by the Receiver, New Direction did not alert Plaintiff until action by the Receiver following the accounting of inventory forced their hand in February of 2023, more than 4 months later.

76.     New Direction attempted to protect its friends at FSD even when this would cost hundreds of New Direction clients their retirement savings.

77.     Despite its knowledge of the problems at FSD, and despite New Direction being aware of the CFTC's investigation culminating in the 2022 proceedings and knowing the Receiver took possession and control over FSD's assets in October of 2022, New Direction did not notify Plaintiff until February of 2023 when it informed her of the receivership.

**VI.     New Direction's Misrepresentations to Plaintiff and the Class.**

78.     On its website, New Direction prominently advertised that its precious metal depositories, including FSD, were "extremely secure and heavily insured."

79.     As the CFTC's lawsuit reveals, even rudimentary verification should have detected that assets went missing from FSD and that FSD lacked proper insurance.

80.     The presence of New Direction's advertising on FSD's website and New Direction's statements that FSD was secure and properly insured caused reasonable customers to believe that FSD was secure and properly insured when it was neither.

81.     These material misrepresentations directly harmed Plaintiff and the Class.

82.     Had Plaintiff and the Class known of the lack of security at FSD, the misappropriation of assets, and the lack of insurance, Plaintiff and the Class would not have stored their precious metals at FSD.

83.     It is extremely impractical, if not impossible, for account holders to verify the security of a depository like FSD. Under New Direction's own rules, a client cannot physically visit the depository or be granted access without advance permission from New Direction.

84.     New Direction represented to clients that it was an expert in the industry with many years of experience. Based upon these representations, Plaintiff and the Class trusted New Direction's recommendation when they advised customers to store their assets at FSD.

85.     On its website, New Direction describes its role as like a bank. Specifically, it describes that it "holds" accounts for customers like "how banks hold checking and saving accounts for their clients."

86.     New Direction goes on to explain that "The main responsibility of a financial custodian is to hold the plan's assets and cash."[16]

87.     These statements would reasonably induce clients to believe that their physical assets were safe when they were entrusted with New Direction, and that New Direction would safeguard them.

88.     To the contrary, New Direction failed to safeguard the assets under its custody, administration, and control, and this cost their customers their retirement savings.

89.     In 2015, New Direction's website advertised the role of First Trust Company of Onaga ("FTCO"), now Mainstar, as Custodian in the management of SDIRAs.

90.     New Direction stated that "FTCO requires [New Direction] to provide complete access to all records and assets of account holders for which it serves as custodian. Although [New Direction] performs all services for the accounts, ultimate control of the assets, including cash, rests with FTCO as the custodian. Physical documentation of account assets are held in FTCO's vault; FTCO also makes independent onsite visits and receives third party information."[17]

91.     FTCO, now Mainstar, as Custodian, and New Direction, as successor Custodian to Mainstar, had access to all records and assets for New Direction account owners. As Custodians, they would have had "ultimate control of the assets."

---

[16] https://ndtco.com/blog/what-is-a-self-directed-ira-custodian/
[17] https://web.archive.org/web/20150329230843/https://newdirectionira.com/new-direction-ira-custodian.php

92.     FTCO and New Direction advertised to Plaintiff and the Class that they conducted independent onsite visits. However, there is no evidence that such visits ever occurred or, if they did occur, that there was any attempt to investigate the security of assets and asset storage.

93.     On information and belief, neither FTCO nor New Direction ever inspected the contents of the vaults at FSD nor verified that they contained the physical materials required to be there, despite sending annual reports to customers saying all assets were accounted for, or Defendants did inspect but never reported their findings or concerns to their clients.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this class action pursuant to FRCP 23(a) and 23(b)(1)-(3) on behalf of herself and a Nationwide Class defined as follows:

> All New Direction precious metals SDIRA owners whose precious metals were purportedly on deposit with FSD as of September 27, 2022, and who lost some or all of the precious metals held in their SDIRAs. Excluded from this class definition, however, are all New Direction customers who participated only in the Silver Lease program discussed in the CFTC lawsuit.

95.     Additionally, Plaintiff seeks a California Subclass, defined as follows:

> All New Direction precious metals SDIRA owners who are or were also California citizens whose precious metals were purportedly on deposit with FSD as of September 27, 2022, and who lost some or all of the precious metals held in their SDIRAs. Excluded from this class definition, however, are all New Direction clients who participated only in the Silver Lease program discussed in the CFTC lawsuit.

96.     This action is brought and may be properly maintained as a class action pursuant to Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

97.     **Numerosity**: The proposed classes are so numerous that individual joinder of all members is impracticable. At least hundreds of New Direction SDIRA accounts were at FSD. The members of the nationwide class and California subclass can be determined with appropriate discovery as Defendants, FSD, and the CFTC/Court appointed receiver all have account numbers, approximate damages, and appropriate contact information for the proposed class members.

98.     **Commonality:** Common legal and factual questions exist which dominate over any questions affecting only individual class members. These include:

    a.  Whether Defendants had a duty to disclose their affiliation with FSD.
    b.  Whether Defendants knew or should have known about the fraudulent scheme involving FSD.
    c.  Whether Defendants implemented adequate safeguards and monitoring for Plaintiff and the Class members' assets at FSD.
    d.  Whether Defendants fraudulently misrepresented financial statements to Plaintiff and the Class members or made such statements with reckless disregard for the truth.
    e.  Whether Defendants made false statements to Plaintiff and the Class.
    f.  Whether Defendants had a duty to act in the interests of their clients including but not limited to warning them about fraud at FSD.
    g.  Whether Defendants violated their duty to safeguard and hold the physical assets in Defendants' custody.

99.     **Typicality:** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

100.     **Adequacy of Representation**: Plaintiff is an adequate Nationwide Class and California Subclass representative because she is a member of each class, and her interests do not conflict with the Nationwide Class or Subclass' interests. Plaintiff has retained counsel who are competent and experienced in class action and investment-related litigation. Plaintiff and counsel intend to prosecute this action vigorously for the Nationwide Class and Subclass and will adequately and fairly protect their interests.

101.     **Predominance and Superiority**: The Nationwide Class and Subclass can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Nationwide Class or Subclass members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Nationwide Class and Subclass member's claim is impracticable. Even

if each Nationwide Class or Subclass member could afford individual litigation, the court system could not. It would be unduly burdensome if hundreds of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and supervision by a single court.

102.     **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

<u>**COUNT ONE**</u>
<u>**FRAUD**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

103.     Plaintiff incorporates by references and realleges each and every allegation above as though fully set forth herein.

104.     As set forth above, New Direction made untrue or misleading statements of material fact including but not limited to the following:

a.  That New Direction was not preferential when recommending depositories or did not provide guidance or recommendations for depository selection.
b.  That New Direction did not benefit from a partnership or business relationship with FSD.

    c.  That FSD was a safe depository where precious metals would be securely locked away and insured.

    d.  That New Direction (and before it FTCO) would make independent onsite visits and receive third party information for physical assets held in SDIRAs.

    e.  That New Direction would undertake reasonable efforts to update the account status.

    f.  That the account holdings statements provided by New Direction were accurate reflections of the assets under custodial control.

    g.  That New Direction was unaware of any problems at FSD or that FSD was and remained a safe and prudent storage option.

    h.  That New Direction would update clients if they became aware of problems with FSD or with the account.

105.    These representations, among others, were made while they were known to be false or with a reckless disregard for truth or falsity.

106.    These representations were intentionally made to induce customer action.

107.    These representations were material in that they were so substantial as to influence Plaintiff. Plaintiff reasonably acted upon the representations.

108.    Plaintiff was harmed by reasonably relying upon the representations.

**COUNT TWO**
**FRAUD THROUGH SILENCE**
**(AGAINST ALL DEFENDANTS)**

109.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

110.    New Direction had knowledge of material facts which Plaintiff did not have and could not have discovered with reasonable diligence including but not limited to the following:

    a.  That New Direction benefitted from a business relationship with FSD.

    b.  That New Direction's recommendation of FSD was due to this business relationship and for personal benefit rather than any genuine benefit to clients.

    c.  That New Direction was not actually verifying the status of any of the precious metals deposited at FSD and was entirely relying on statements by FSD as to the physical status of assets in the account.

    d.  That New Direction had not actually verified that FSD was insured despite saying it was a requirement for all depositories.

    e.  That FSD was not registered with the CFTC

f.   That FSD was being investigated by the CFTC and other federal agencies on multiple grounds.
g.   That New Direction removed FSD from its list of approved depositories.
h.   That New Direction was aware of widespread problems with FSD.
i.   That New Direction was aware the security of customer assets was at risk.

111.   New Direction had a duty to convey these material facts to its clients.

112.   New Direction intentionally failed to disclose these facts.

113.   Plaintiff and the Class members reasonably relied upon New Direction to communicate these material facts including the relationships between FSD and New Direction.

114.   Had New Direction disclosed these facts, Plaintiff would not have selected FSD or would have scrutinized it more carefully.

115.   As a result of New Direction's failure to disclose these facts, Plaintiff and like Class members suffered harm.

## COUNT THREE
## NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

116.   Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

117.   Defendants were negligent through their failure to investigate FSD, failure to provide accurate financial reports regarding Plaintiff's holdings, failure to warn clients once problems were known, and general negligent practices including failure to verify asset transfers, removing oversight, and carelessness.

118.   Defendants knew or should have known that their investigation into the practices of FSD was insufficient.

119.   Defendants knew that their own policies left Defendants as the only real source of information about the precious metals held by FSD.

120.    Defendants represented themselves as experts and took it upon themselves to recommend their clients to use FSD's services, without any verification or audit.

121.    This breached the duty of reasonable care to ensure the information reported to their customers was accurate and that recommendations were in line with their purported expertise.

122.    Due to this negligent breach, Plaintiff and the Class suffered damages due to the theft of their precious metals while they were under Defendants' management.

123.    Defendants failed to notify clients when they removed FSD from the list of approved depositories.

124.    Defendants had a duty to notify the hundreds of clients who had entrusted them with their retirement savings that a depository Defendants had recommended was no longer considered suitable by Defendants, including due to the risk to the client assets.

125.    Defendants breached that duty to their clients.

126.    As a result, Plaintiff and the Class suffered harm in the loss of the vast majority of assets for which New Direction was responsible.

127.    Defendants also engaged in negligent and careless practices.

128.    New Direction also took on a joint custodian-administrator role despite knowing that this removed potential oversight of the administration process.

129.    Despite taking dual responsibilities as custodian-administrator, and listing the nature of their business as "safekeeping personal property of every description" as well as buying and selling precious metals, Defendants either took no steps or took entirely inadequate steps to "safekeep [the] personal property" of Plaintiff and Class members.

130.    Defendants never audited or otherwise took reasonable measures to verify the security or even the existence of precious metals they purported to safeguard at FSD.

131.     New Direction failed to ensure the assets under their trust were not comingled with other property, despite this being required by federal law, as they represented to clients.

132.     New Direction failed to notice or did not care about the theft of the vast majority of the precious metals supposedly in New Direction accounts maintained at FSD.

133.     New Direction breached its duty of care as custodian, administrator, and expert.

134.     As a result, Plaintiff and the Class suffered harm in the loss of the vast majority of assets under New Direction custody stored at FSD.

### COUNT FOUR
### NEGLIGENT MISREPRESENTATION
### (AGAINST ALL DEFENDANTS)

135.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

136.     Defendants provided false information to Plaintiff including but not limited to misrepresentations about its business relationship with FSD; account balances and statements; the level of oversight Defendants would provide over the accounts under their custody; that FSD was a safe or suitable depository; that Defendants had no concerns about the safety and security of assets at FSD; and that FSD had appropriate insurance, among other material misrepresentations.

137.     Defendants failed to exercise reasonable care or basic competence in communicating this false information. Plaintiff relied on this false information.

138.     Plaintiff sustained damage as a result of Defendants' negligent misrepresentations.

### COUNT FIVE
### NEGLIGENT NONDISCLOSURE
### (AGAINST ALL DEFENDANTS)

139.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

140.    As detailed above, New Direction failed to disclose critical facts regarding FSD including but not limited to New Direction's beneficial business relationship with FSD and New Direction's decision to remove FSD from the approved depository list.

141.    New Direction represented itself as an impartial entity not associated with any specific depository.

142.    In reality, New Direction directed clients towards FSD due to their business relationship with FSD, as alleged herein.

143.    New Direction knew or should have known that its failure to disclose its true relationship with FSD to Plaintiff would cause her to justifiably act or refrain from acting in a business transaction.

144.    If New Direction had disclosed its relationship with FSD, Plaintiff would not have stored assets with FSD or would have scrutinized it more carefully.

145.    As a result, Plaintiff suffered harm from the stolen precious metals as a result of New Direction's negligent nondisclosure.

**COUNT SIX**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST ALL DEFENDANTS)**

146.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

147.    Plaintiff entered into a business relationship where Defendants agreed to administer and safeguard assets Plaintiff entrusted to Defendants.

148.    In entrusting the precious metals to Defendants, Plaintiff placed trust and confidence in Defendants to manage, secure, insure, and maintain the SDIRAs and precious metals

therein, to tell Plaintiff the truth, to disclose any special relationship with depositories and other relevant parties, to be an honest broker, and to provide the services advertised.

149.    Defendants had a duty to act in good faith and with regard for Plaintiff's interests and to not engage in self-dealing.

150.    By engaging in the conduct outlined above, including but not limited to failing to advise Plaintiff of their relationship with FSD, the misrepresentations described above, and the negligent acts described above, Defendants breached their fiduciary duty.

151.    Defendants additionally failed to safeguard the precious metals with which they were entrusted.

152.    Defendants' failure is not equivalent to merely a poorly performing investment. Plaintiff is not suing because the value of precious metals decreased, but rather because the metals went missing while they were in the custody of Defendants.

153.    On its website New Direction repeatedly encourages clients to think of New Direction as like a bank.

154.    As New Direction itself says on its website: "The main responsibility of a financial custodian is to hold the plan's assets and cash,"[18] which New Direction failed to do.

155.    New Direction's failure caused Plaintiff and Class members to incur harm.

**COUNT SEVEN**
**CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**(AGAINST ALL DEFENDANTS)**

156.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

---

[18] https://ndtco.com/blog/what-is-a-self-directed-ira-custodian/

157.     Defendants' business acts and practices are subject to the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et. seq.* ("CLRA").

158.     Plaintiff is a citizen of California who contracted with Defendants for services and is a "consumer" under the CLRA.

159.     Defendants engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to Plaintiff and the Subclass in violation of Cal. Civ. Code §§ 1750 and 1770(a)(5), (7), (9), (14), and (16).

160.     The conduct of Defendants including the misrepresentations, nondisclosure, and breach of fiduciary duty alleged herein constitute deceptive acts and practices under the CLRA.

161.     Specifically, Defendants violated the following provisions of the CLRA which are defined as unfair or deceptive business practices:

   a. Misrepresenting the source, sponsorship, approval, or certification of goods and services.
   b. Misrepresenting the affiliation, connection, or association with, or certification by, another.
   c. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.
   d. Advertising goods or services with intent not to sell them as advertised.
   e. Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.

162.     The specific representations by Defendants read and relied upon by Plaintiff included:

   a. That New Direction was not preferential when recommending depositories or did not provide guidance or recommendations for depository selection.
   b. That New Direction did not benefit from a partnership or business relationship with FSD.
   c. That FSD was a safe depository where precious metals would be securely locked away and insured.
   d. That New Direction (and before it FTCO) would make independent onsite visits and receive third party information for physical assets held in SDIRAs.
   e. That New Direction would undertake reasonable efforts to update the account status.
   f. That the account holdings statements provided by New Direction were accurate reflections of the assets under custodial control.

g.   That New Direction was unaware of any problems at FSD or that FSD was and remained a safe and prudent storage option.

h.   That New Direction would update clients if they became aware of problems with FSD or with the account.

163.   Plaintiff lost money or property as a result of Defendants' misconduct.

164.   Plaintiff, on behalf of herself and all Subclass members, demands judgment against Defendants under the CLRA for injunctive relief.

165.   Pursuant to Cal. Civ. Code § 1782(a), Plaintiff will serve Defendants with notice of their alleged violations of the CLRA by certified mail return receipt requested. If, within thirty days after the date of such notification, Defendants fail to provide appropriate relief for its violations of the CLRA, Plaintiff will amend this complaint to seek monetary damages.

166.   Notwithstanding any other statements in this complaint, Plaintiff does not seek monetary damages in conjunction with her CLRA claim—and will not do so—until this thirty-day period has passed.

**COUNT EIGHT**
**CALIFORNIA UNFAIR COMPETITION LAW**
**(AGAINST ALL DEFENDANTS)**

167.   Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

168.   Defendants' business acts and practices were unlawful, unfair and fraudulent under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq.* ("UCL").

169.   Defendants business and practices were "unlawful" within the meaning of the UCL because they violated California common and statutory law, as alleged herein.

170.   Defendants' business acts and practices were "unfair" within the meaning of the UCL. California has a strong public policy of protecting consumers' interests. Defendants' business practices violated this public policy. Defendants' business acts and practices are "unfair"

in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm Defendants caused to Plaintiff and Subclass is significant, and there is no corresponding benefit resulting from such conduct.

171.    Defendants' business acts and practices are "fraudulent" within the meaning of the UCL. Defendants made false and misleading statements to Plaintiff and the Subclass. Defendants' business acts and practices were likely to, and did, deceive members of the public including Plaintiff and Class members into believing their assets were secured and insured.

172.    The specific false and misleading representations by Defendants read and relied upon by Plaintiff included:

a.  That New Direction was not preferential when recommending depositories or did not provide guidance or recommendations for depository selection.
b.  That New Direction did not benefit from a partnership or business relationship with FSD.
c.  That FSD was a safe depository where precious metals would be securely locked away and insured.
d.  That New Direction (and before it FTCO) would make independent onsite visits and receive third party information for physical assets held in SDIRAs.
e.  That New Direction would undertake reasonable efforts to update the account status.
f.  That the account holdings statements provided by New Direction were accurate reflections of the assets under custodial control.
g.  That New Direction was unaware of any problems at FSD or that FSD was and remained a safe and prudent storage option.
h.  That New Direction would update clients if they became aware of problems with FSD or with the account.

173.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiff and Subclass members were injured, lost money or property, and suffered the various types of damages alleged herein.

174.    The UCL states that an action may be brought by any person who has "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. &

Prof. Code § 17204. Plaintiff and Subclass members suffered injury in fact and lost money or property as a result of Defendants' conduct, as alleged herein.

175.     Cal. Bus. & Prof. Code § 17203 states: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments [...] as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

176.     Plaintiff and Subclass members are entitled to the injunctive relief requested herein to address Defendants' past and future acts of unfair competition.

177.     Plaintiff and Subclass members are entitled to restitution of money and property that was acquired by Defendants by means of its unfair competition and restitutionary disgorgement of all profits accruing to Defendants as a result of its unfair business practices.

178.     Plaintiff and Class Members seek all monetary and non-monetary relief allowed by the UCL, including reasonable attorneys' fees under Cal. Code of Civ. Procedure § 1021.5.

**COUNT NINE**
**SUCCESSOR LIABILITY**
**(AGAINST NDTCO)**

179.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

180.     NDTCO is liable to Plaintiff for any damages awarded for NDIRA's actions or inaction under the theory of successor liability.

181.     On information and belief NDTCO has the same or substantially the same officers and directors as NDIRA.

182.    On information and belief NDIRA effectively ceased business when NDTCO was created.

183.    The NDIRA website address automatically redirects to NDTCO's website.

184.    NDTCO's website specifically advertises that "New Direction IRA became New Direction Trust Company." It further repeatedly asserts that NDTCO is a continuation of NDIRA.

185.    NDTCO has the same owners as NDIRA.

186.    Even if NDTCO's acquisition of NDIRA's assets and clients was not a continuation, successor liability would still apply as this would be merely a merger or consolidation of entities.

187.    NDTCO is liable to Plaintiff for any judgment against NDIRA.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of herself and the Class and Subclass set forth herein, respectfully request the following relief:

A.    That the Court certify this action as a class action and appoint Plaintiff and their counsel to represent the Class;

B.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the assets of clients by implementing improved security controls;

C.    That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D.    That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E.   That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F.   That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

G.   That the Court award pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated this 5th day of January, 2024.

*/s/ Roger N. Walter*
Roger N. Walter, #08620
MORRIS LAING LAW FIRM
800 SW Jackson, Suite 1310
Topeka, Kansas  66612
Phone: (785) 232-2662
Fax: (785) 232-9983
Email: rwalter@morrislaing.com

SCHUBERT JONCKHEER & KOLBE LLP
Robert C. Schubert(rschubert@sjk.law)
Willem F. Jonckheer (wjonckheer@sjk.law)
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161

*Attorneys for Plaintiff and the Proposed Classes*